**UNITED STATES of AMERICA,
Plaintiff–Appellee,**

v.

**Barry L. KNIPP (91–5312), and Vernon L. Hamilton (91–5452), Defendants–
Appellants.**

Nos. 91–5312, 91–5452.

United States Court of Appeals,
Sixth Circuit.

Argued March 30, 1992.

Decided April 27, 1992.

Rehearing Denied June 3, 1992.

---

Louis DeFalaise, U.S. Atty., David A. Marye, Asst. U.S. Atty. (argued and briefed), Office of U.S. Atty., Lexington, Ky., for plaintiff-appellee.

Robert L. Templeton, Hermansdorfer & Templeton, Ashland, Ky. (argued and briefed), for defendant-appellant Vernon L. Hamilton.

Benjamin P. Hicks, Lexington, Ky. (argued and briefed), for defendant-appellant Barry L. Knipp.

Barry L. Knipp, pro se.

Before: MILBURN and SUHRHEINRICH, Circuit Judges, and TIMBERS, Senior Circuit Judge.[*]

MILBURN, Circuit Judge.

Defendants Barry L. Knipp and Vernon L. Hamilton appeal their jury convictions on one count of conspiracy (a) to defraud a federally insured financial institution and (b) to misapply the monies, funds, credits and securities of a federally insured financial institution in violation of 18 U.S.C. § 371, and six related counts of aiding and abetting each other in devising a scheme to defraud federally insured financial institutions in violation of 18 U.S.C. §§ 2 and 1344. On appeal, the issues are (1) whether Congress' extension of the statute of limitations from five years to ten years violates the Ex Post Facto Clause of the United States Constitution, (2) whether the district court abused its discretion in denying defendants' motions for mistrial based on the questioning of a prospective juror, (3) whether the district court erred in denying defendant Knipp's motion for a judgment of acquittal, and (4) whether the district court abused its discretion in denying defendant Knipp's motion for new trial. For the reasons that follow, we affirm.

## I.

Defendant Barry L. Knipp was president of the People's Bank of Olive Hill, Kentucky ("PBOH"), and his co-defendant, Vernon L. Hamilton, was president of Hamilton Hardwood Lumber Company, Inc. ("HHLC"), a lumber business in Carter County, Kentucky. HHLC maintained a checking account at PBOH. Hamilton also maintained a checking account in the name of Hamilton Farms at the First National Bank of Grayson, Kentucky ("FNBG"). Both banks were insured by the FDIC.

In 1983 and early 1984, HHLC borrowed $1,200,000 from PBOH and also established a $750,000 ready reserve account that functioned as a demand loan to cover overdrafts up to $750,000. Defendant Knipp was the bank's account officer for all these loans. By November 1984, the ready reserve account established for HHLC had reached its $750,000 limit, but Hamilton continued to write checks on the account which drove it into an overdraft status. By March 1985, the HHLC account had been overdrafted to the extent of $552,153.06. Because PBOH was at its legal lending limits with HHLC, and in order to disguise the overdraft status of the account, a check kiting system was set up by defendant Hamilton to cycle checks between the HHLC account at PBOH and the Hamilton Farms account at FNBG.

According to various employees of PBOH, the kite was operated by the daily transfer of checks, drawn on uncollected funds, between the two banks. On instructions from defendant Knipp, employees of PBOH kept a daily watch on HHLC's checking account for overdrafts beyond the

* Honorable William H. Timbers, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation.

$750,000 ready reserve fund. When an overdraft check was presented, payment of it was delayed while a telephone call was placed to defendant Hamilton to advise him of the amount of the deposit he would be required to make to cover the overdraft. Hamilton would then deposit at PBOH one or more checks drawn on the Hamilton Farms account at FNBG. As the amount of the overdrafts spiraled upward, Hamilton was required to come to PBOH daily and deposit checks drawn on the Hamilton Farms account at FNBG to cover HHLC's overdrafts. He kept the Hamilton Farms account stocked with checks written on the HHLC account at PBOH.

The evidence shows that defendant Knipp knew about this situation and facilitated its continuance by instructing his employees to hold certain overdraft checks while they advised Hamilton of the amount of the deposit necessary to cover them. When Julia Sparks, a bank employee, raised her concerns about this procedure with Knipp, he told her that Hamilton was simply loaning money from one business to another. At Knipp's direction, Sparks kept track daily of all the checks and deposits passing through the HHLC account, and she prepared a weekly report of these transactions for Knipp. The reports showed that the daily deposits required of Hamilton grew larger and larger until they exceeded $200,000 a day.

Sometime in December 1984, Knipp asked Charles Marshall, then a partner in an accounting firm which did tax work for PBOH, to attend a meeting with Knipp and Hamilton. At this meeting, and in front of Marshall, Hamilton assured Knipp that he was not kiting checks and that there were sufficient funds in the FNBG account to cover the deposits he made at PBOH. Nothing was done to stop HHLC's continuing overdrafts and the daily deposits required to cover them.

Also in December 1984, Knipp telephoned Paul McGuire, chairman of the board of Bank Josephine in Prestonburg, Kentucky, and asked McGuire to make a loan to Hamilton in the sum of $176,750. It was McGuire's understanding that PBOH could not extend this loan to Hamilton because PBOH was at its lending limits as to Hamilton. Bank Josephine made the loan, and the proceeds were deposited into the Hamilton Farms account at FNBG.

Matters began coming to a head in February 1985 when FNBG installed a new computer system that could track floats on items being deposited in that bank. The Hamilton Farms account immediately appeared on that new report with a large uncollected balance in excess of $200,000. In investigating the Hamilton Farms account, FNBG's controller determined that 3, 4, or 5 checks, all for different amounts, and totaling between $230,000 and $250,000, were being written and deposited back and forth between the Hamilton Farms account at FNBG and the HHLC account at PBOH on a daily basis. The same number of checks in the same amounts were being deposited each day.

Based on this investigation, FNBG returned four checks drawn on the Hamilton Farms account at FNBG and deposited in the HHLC account at PBOH for collection. Defendant Knipp immediately requested a meeting with FNBG officials to discuss the returned checks, and on February 28, 1985, a meeting was held at which FNBG officials explained their concern over Hamilton's use of uncollected funds. Knipp assured FNBG that the activity between the two accounts would stop. It did not stop, however, but continued for several weeks until, in April 1985, FNBG returned fourteen checks totaling $907,476 to PBOH as drawn on uncollected funds. FNBG then closed the Hamilton Farms account.

## II.

### A.

Both defendants argue that the district court should have granted their motions to dismiss this case because it was brought in violation of the Ex Post Facto provisions of Article I, Section 9, of the

United States Constitution.[1] The date of the last offense mentioned in the indictment is April 30, 1985, and the statute of limitations in effect on that date was the five-year limitations period established by 18 U.S.C. § 3282. On August 9, 1989, before the five-year statute of limitations ran as to this case, Congress enacted 18 U.S.C. § 3293, which extended the limitations period applicable to the offense as charged from five years to ten years. Defendants were indicted on July 24, 1990. Therefore, the old five-year statute of limitations had run, but the new ten-year statute had not. Defendants now raise constitutional questions which, as questions of law, this court reviews de novo. *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.), *cert. denied*, 488 U.S. 941, 109 S.Ct. 363, 102 L.Ed.2d 353 and 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988).

Each defendant relies on the Supreme Court's summary of the meaning of the Ex Post Facto Clause in *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925):

> It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any *defense available according to law at the time when the act was committed*, is prohibited as *Ex Post Facto.*

(Emphasis added). This language was recently quoted with approval by the Court in *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990), and defendants seek to employ that part of it emphasized above to argue that the extension of the limitations period to ten years deprived them of the opportunity to plead the previous five-year limitations period as a bar to their prosecutions.

Pleading an expired limitations period is certainly a defense in the general sense that it is a defensive measure. More particularly, however, it is a matter in bar of prosecution and as such is distinguishable from a "pure" defense, which defeats one or more of the elements of the crime. This distinction was noted and strongly reinforced by the Court in *Youngblood* when the Court, after an extended analysis, decided to overrule *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), because in *Kring* it had erred in confusing procedural defenses with defenses to the elements of the crime. Focusing on the meaning of the word "defense" as used in the quotation from *Beazell* and applying it to *Kring*, the Court said:

> But the use of the word "defense" carries a meaning quite different from that which appears in the quoted language from *Beazell*, where the term was linked to the prohibition on alterations in "the legal definition of the offense" or "the nature or amount of the punishment imposed for its commission." *Beazell*, 269 U.S., at 169–170, 46 S.Ct. at 68–69. The "defense" available to *Kring* under earlier Missouri law *was not one related to the definition of the crime*, but was based on the law regulating the effect of guilty pleas. Missouri had not changed any of the elements of the crime of murder, or the matters which might be pleaded as an excuse or justification for the conduct underlying such a charge; it had changed its law respecting the effect of a guilty plea to a lesser included offense.

*Youngblood*, 110 S.Ct. at 2723 (emphasis added).

Thus, "defense" as used in *Beazell* means a defense related to the definition or elements of the crime. It does not have the much broader meaning assigned to it by defendants, because a plea in bar is not related to the definition of a crime and is not pleaded as a nullification of one or more of its elements or as an excuse or justification for its commission. Accord-

---

**1.** Article I, Section 9, of the United States Constitution provides in relevant part: "No Bill of Attainder or Ex Post Facto Law shall be passed."

ingly, defendants' reliance on *Youngblood* is entirely misplaced.

Moreover, the courts of appeals considering this issue have held that the extension of a limitations period before that period has run does not violate the Ex Post Facto Clause. In *United States ex rel. Massarella v. Elrod,* 682 F.2d 688, 689 (7th Cir. 1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1426, 1427, 75 L.Ed.2d 787 (1983), the Seventh Circuit held that the extension of a period of limitations was procedural only and did not implicate the Ex Post Facto Clause.

> *Massarella*'s objection to the enlargement of the limitation period has no merit. Extending a limitation period *before* a given prosecution is barred does not violate the *ex post facto* clause ... As the Supreme Court recently noted, "no *ex post facto* violation occurs if the change effected is merely procedural, and does 'not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.'"

The extension of the statute of limitations in this case was just such a "merely procedural" change.

(Citations omitted).

■ The Second Circuit in *Falter v. United States,* 23 F.2d 420, 425 (2d Cir.), *cert. denied,* 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1928), and the Ninth Circuit in *Clements v. United States,* 266 F.2d 397, 399 (9th Cir.), *cert. denied,* 359 U.S. 985, 79 S.Ct. 943, 3 L.Ed.2d 934 (1959), also concluded that extensions of limitations periods do not implicate the Ex Post Facto Clause. Although this circuit has not directly decided this issue, it has stated that "a change in the law which is procedural is not *ex post facto* even though it may work to the disadvantage of the defendant." *United States v. Prickett,* 790 F.2d 35, 37 (6th Cir.1986).

The defensive use of a statute of limitations is a procedural defense in the nature of a plea in bar. Because it has nothing to do with the internal structure of the crime or its elements, it is not the kind of "defense" that the Supreme Court was referring to in *Beazell* when it stated that the Ex Post Facto Clause was violated if a defendant was later deprived of a defense that had been available to him at the time he committed the crime in question. Instead, the defensive use of a statute of limitations is merely a procedural matter, and it follows that Congress' extension of the statute of limitations in this case did not violate the Ex Post Facto Clause.

### B.

■ Both defendants argue that the district court abused its discretion in failing to dismiss the jury panel and grant a mistrial because, during voir dire, a prospective juror stated that she knew one of the government's witnesses and that her personal knowledge of him would lead her to believe his testimony.

> Mr. Marye: What—as I say, if Mr. Smith were to be a witness, would you automatically believe or disbelieve what he had to say as a result of your friendship or being neighbors?
>
> Juror Taylor: I have known him all my life. I believe anything he tells me. He always tells me when his corn is ready.
>
> Mr. Marye: Sure. So, you know, I don't know—
>
> Juror Taylor: No, I won't say that. I just believe him.
>
> Mr. Marye: Well, no that's fine, and you need to be truthful with us. Let's say, I don't know there is going to be a serious dispute between what he says and someone else. But I anticipate the testimony from him and other persons who were going to testify similar (sic) about the same situation—
>
> Juror Taylor: I trust him and I have known him all my life, so I would trust him what he says.

J.A. 125–26. Following this colloquy, the court excused juror Taylor for cause and, at a bench conference, expressed some concern that the jury panel had been tainted:

> The Court: It has been seriously tainted. I am not necessarily saying it's been prejudiced, but if this witness—if Don Smith holds—is a key role and if—I don't know—I don't know how it yields be-

cause I haven't heard the case, but they are saying he plays a key role and his testimony is a key. And you've just called on a person to testify that this witness is—something essential about this juror telling this jury panel that she'd believe anything he said.

J.A. 129; Brief of Appellant Knipp at 17. The court also stated:

I will instruct the jury before we start, the credibility of any witness has to be weighed along with all of the evidence in the case and to make that determination based on the evidence in the case. All right?

J.A. 128. Defendants do not contend that they sought any further instructions. They did, however, move for a mistrial and now argue that their rights to an impartial jury under the Sixth Amendment were violated by the district court's refusal to dismiss the jurors who overheard Taylor's opinion of Smith's credibility.

■ In *United States v. Wood*, 299 U.S. 123, 145–46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), the Supreme Court observed:

Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient or artificial formula.

Because there is no "ancient and artificial formula," the question of jury impartiality is committed to the sound discretion of the district court.

The ruling on a motion to dismiss or for a mistrial based on improper statements during voir dire is within the sound judicial discretion of the trial court. Moreover, the court's ruling will not be disturbed, absent a clear showing of abuse of that discretion.

*United States v. Gibbons*, 607 F.2d 1320, 1330 (10th Cir.1979). In *Gibbons*, a prospective juror in a drug case stated that her ability to deliberate might be affected because her husband's cousin had been a narcotics agent and had been killed in Texas. The district court questioned the jurors in order to satisfy itself that the trou-

blesome statement would not affect jury impartiality and then gave a cautionary instruction to disregard the statement.

In the present case, the district court did not question the remaining jurors about the effects of the statement in question, but no party asked him to do so. He did announce his intention to give a preliminary instruction on the subject of witness credibility, and the parties accepted this as sufficient under the circumstances.

In any event, the juror's statement in *Gibbons* posed a much greater threat of prejudice than the relatively innocuous statement made in this case. Juror Taylor's personal opinion of Smith's credibility was a general opinion, one based on her neighborly association with Smith, not one concerning the testimony he was to give at trial. As such, it would require some hysteria to conclude that the comment had any real impact on the impartiality of the remaining jurors who, it must be assumed, followed the district court's instructions to judge witness credibility for themselves.

■ The district court was also correct in waiting to see where Smith's testimony fit in the scheme of the case and whether his credibility would in fact be an important issue in the case. Neither defendant testified, and no witnesses contradicted the testimony of Don Smith or C.J. Johnson regarding the essential facts in the case. Indeed, as defendant Hamilton admits in his brief, Smith's testimony "tracked that given by fellow Bank officer C.J. Johnson, and to a lesser extent, the testimony of former Bank board member Earl M. McGuire...." Brief of Appellant Hamilton at 38. Thus, Smith's testimony was not the pivotal factor in this trial, and his credibility was not the pivotal factor in his testimony. Under these circumstances, the possibility of real prejudice to the jury's impartiality is too remote and speculative to support a reversal based on an abuse of discretion by the district court. *Cf. United States v. Segovia*, 576 F.2d 251, 253 (9th Cir.1978) ("[P]ossible prejudice resulting ... from the prospective jurors unfortunate comments is far too remote and speculative to support a finding of plain error.").

### C.

■ Defendant Knipp argues that the district court erred in failing to grant his motion for judgment of acquittal on grounds that the evidence was insufficient to support his conviction. A denial of a motion for judgment of acquittal is proper if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Gallo,* 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986). "A defendant claiming 'insufficiency of the evidence bears a very heavy burden.' *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)." *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

■ Defendant Knipp argues that the proof was insufficient to convict him because he received no known benefit from the bank or any third party as the result of his alleged fraud. Under the statute, however, it is not necessary for the government to demonstrate that defendant personally benefited from his scheme to defraud the financial institution. *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987). Thus, the proof in that respect is in no way deficient.

■ On the other hand, the evidence does show that defendant Knipp knew in detail about the transfer of funds between the two accounts. He assisted in the maintenance of this scheme by instructing Ms. Sparks to compute the amount of the deposit by Hamilton necessary to keep the HHLC account from being overdrawn and to telephone Hamilton each day to advise him of that amount. The proof also shows that Knipp arranged a meeting with Charles Marshall and Vernon Hamilton to discuss the possibility of check kiting, but this act could have been interpreted as little more than an attempt to manufacture a defense. The jury may well have concluded that defendant Knipp allowed defendant Hamilton's overdrafts to continue and that he facilitated the kite to cover them

because the overdrafts amounted to huge, unauthorized loans beyond the single customer legal lending limits, a violation of established banking regulations, the discovery of which may well have endangered his job. Perhaps that is also why he concealed HHLC's serious overdraft status from the bank's board of directors from October 1984 forward.

From all this evidence, a rational jury may have decided that Hamilton could not have continued his check kite for so long without Knipp's active assistance. Viewed in the light most favorable to the prosecution, the proof in this case is sufficient to support Knipp's conviction, and the district court was correct in denying Knipp's motion for judgment of acquittal.

### D.

■ Defendant Knipp finally argues that the district court abused its discretion in denying his motion for a new trial on grounds of newly discovered evidence. That evidence was that Charles Marshall, the accountant who testified in this case, paid $5,000 of his own money to the accounting firm of Kelly and Galloway to dissuade them from suing Hamilton. Knipp contends that "[t]he most important thing about the $5,000 payment was not the impeachment value, but in fact the negligence or other wrongdoing that caused the payment to be made." Brief of Appellant Knipp at 28.

What this means is uncertain. Apparently, Knipp speculates that Marshall or Hamilton committed negligent or illegal acts which prompted the $5,000 payment. There is no evidence in support of this, however, by affidavit or otherwise. Defendant Knipp's only claim is that he overheard co-defendant Hamilton state that Charles Marshall paid $5,000 to Kelly and Galloway on behalf of Hamilton. There is no independent proof that the supposed payment actually occurred, nor is there any evidence to indicate the purpose of any such payment.

■ In *United States v. O'Dell,* 805 F.2d 637, 640 (6th Cir.1986), *cert. denied,* 484 U.S. 859, 108 S.Ct. 170, 98 L.Ed.2d 124

(1987), this court set out a four-part test to be applied in situations where new trials are sought on the basis of newly discovered evidence. The four elements are:

(1) that the new evidence be discovered after the trial;

(2) that the evidence could not have been discovered earlier by due diligence;

(3) that the evidence was material and not merely cumulative or impeaching; and

(4) that the evidence would likely produce an acquittal.

Defendant's argument fails the third and fourth parts of the *O'Dell* test. The new evidence proffered by defendant is of highly doubtful materiality and appears, at best, to be of some minor impeachment value. However, even that is not clear. Moreover, there is no likelihood that this uncertain evidence would produce an acquittal if a new trial were granted. Accordingly, the district court did not abuse its discretion in denying defendant's motion for a new trial. *See United States v. Seago*, 930 F.2d 482, 488 (6th Cir.1991) (abuse of discretion standard applies).

### III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.