**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Earl Jackson BURNETTE,
Defendant–Appellant.**

**No. 91–6484.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 14, 1992.

Decided Dec. 10, 1992.

---

James E. Arehart, David P. Grise, Asst. U.S. Attys., Karen K. Caldwell, U.S. Atty., Lexington, KY, Jacquelyn A. Jess, Asst. U.S. Atty. (argued and briefed), Covington, KY, for plaintiff-appellee.

James E. Hibbard (argued and briefed), London, KY, for defendant-appellant.

Before: KENNEDY and JONES, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

Defendant–Appellant Earl Jackson Burnette[1] was sentenced under the federal sentencing guidelines after a jury convicted him of knowingly possessing, and of aiding and abetting the knowing possession of stolen goods in interstate commerce. His sentence included an enhancement for obstruction of justice, apparently because his testimony at trial did not square with that of other witnesses. Burnette appeals this enhancement. Because we hold that the district court did not specifically find Burnette's testimony to be untruthful, we reverse Burnette's sentence, and remand the case for resentencing in accordance with this opinion.

## I. The Case

At Burnette's trial, the following evidence was adduced. The Aluminum Company of America ("Alcoa") operates a plant in Alcoa, Tennessee, where it produces aluminum coils. These coils weigh between 8,000 and 18,000 pounds each, and are hauled from the plant on flatbed trucks or by railroad car. Wrapped in blue and white "Alcoa" paper and containing a cardboard coil stamped with "Alcoa" and a lot number, these aluminum coils are shipped in interstate commerce to out-of-state beverage can companies.

On four occasions in 1989—April 13, May 19, October 20 and November 17—truckloads of coiled aluminum were stolen en route to various locations outside of Tennessee. The total weight of the hijacked aluminum was about 156,000 pounds. This amount of aluminum was worth approximately $189,500.

During 1989, T.M.G. Enterprises operated a recycling center called "Metalcenter" in Louisville, Kentucky. Metalcenter routinely purchased scrap metal. The company paid for loads worth more than $750 by check. Between April 20 and June 12, 1989, Metalcenter made out nine checks to Burnette and seven checks to co-defendant Donnie Whitlock, the sixteen totalling approximately $35,000. The average weight of the loads brought to Metalcenter by Burnette and Whitlock was around 3,000 pounds. Like the stolen material, the scrap metal purchased was "mixed low copper clip" aluminum—an aluminum alloy with a low copper content.

---

1. Burnette is sometimes spelled "Burnett" in the record.

Roger Jewell was a driver for Eck Miller Transportation, which hauled aluminum coils for Alcoa. On April 13, 1989, he picked up a tarpaulin-covered flatbed trailer from a truck stop in Clinton, Tennessee, upon the request of a fellow trucker, Gary Brewer. At Brewer's direction, Jewell hauled the trailer to Burnette's property. After meeting Burnette, Jewell unhooked the trailer and left Burnette's property. Several days later, the dispatcher at Eck Miller Transportation told Jewell that a load of Alcoa aluminum had been stolen.

Jewell returned to Burnette's house two weeks later to pick up the trailer. He found the flatbed stripped of its contents, tarpaulin, and tie-downs. At Brewer's request, Jewell hauled the trailer to Middlesboro, Kentucky, where he left it in a parking lot.

George Dooley was the son of Burnette's girlfriend. In April 1989, Burnette paid Dooley to help him and Brewer cut up aluminum coils. The aluminum cut was wrapped in blue and white paper marked "Alcoa" and was stored on Burnette's property in a shed-like structure. On several occasions, Dooley burned "Alcoa" cardboard cores from the coils he had cut into pieces. Dooley and Burnette loaded the cut aluminum into the back of a pickup truck. The aluminum was then hauled to a Louisville junkyard where the scrap aluminum was exchanged for cash.

On May 19, 1989, Jewell and Brewer removed a second trailer from a truck stop. Jewell testified that Burnette participated in the heist as a lookout. Once again, Jewell delivered the load to Burnette's property. The trailer was unloaded in Burnette's presence. Jewell and Brewer then abandoned the empty trailer in a truckstop parking lot in Jellico, Tennessee.

In October of 1989, Michael Mills, who operated a body shop and garage, brokered a sale of three truckloads of aluminum from Burnette and Brewer to Robert Wyatt. Also in October 1989, Rodney Adams, Mills' nephew, testified that he participated in aluminum cutting operations with Brewer in a wooded area which contained a shed.

On November 17, 1989, Jewell's trailer of aluminum coils was stolen from a truck stop in London, Kentucky. Jewell's stripped trailer was recovered several days later from the side of a highway. Jewell testified that he had not given anyone permission to take his trailer. He testified that George Brewer was aware of its contents and its location at the truck stop.

Burnette and Brewer returned to Mills in November 1989. Mills was asked to help cut up a load of aluminum. He testified that Brewer, driving a tractor trailer, delivered two coils to Mills' garage. Burnette allegedly provided saw blades, and hauled off the cut aluminum in cattle and horse trailers to sales centers.

Nelton Neal, a cashier at Denny Beckner and Company ("Recycling Center"), testified that Burnette sold a total of five loads of clean aluminum pieces to the Recycling Center on November 21 and 22, 1989. Burnette was paid with a separate check for each load, for a total of approximately $13,000.

Following an informant's tip, the Federal Bureau of Investigation ("FBI") surveilled Mills' property. After taking notice of numerous pieces of aluminum on the property, the FBI executed a search warrant on Mills' garage. During the search, they recovered four "Alcoa" cardboard cores with lot numbers matching those on the bills of lading for the stolen loads of aluminum. The FBI also found aluminum at the Recycling Center matching aluminum at Mills' garage. And behind Burnette's home, the FBI discovered saw blades, saws and plywood that fit the "side kits" for flatbed trailers.

Burnette took the stand at his trial as the only defense witness. His testimony contradicted that of prosecution witnesses. Burnette admitted seeing some shiny aluminum on the other side of the fence that bordered his property, but he never saw any large coils of it, and maintained that aluminum was never brought to his property. He claimed that he never acted as a lookout during any of the thefts of the trailers. He also maintained that he did not know that the aluminum he hauled

from Mills' garage was stolen, nor was he aware it had been cut from coils.

Burnette testified that the saw blades found on his property were used in legitimate business activities. He explained that he and Gary Brewer, his cousin, specialized in buying trailers, cutting them up, and selling them. Once the trailers were cut up, Burnette would haul the metal to Metalcenter in Louisville and sell it. Burnette stated that it was just a coincidence that all of the Metalcenter checks made out to him were issued shortly after the first load of aluminum was stolen.

Burnette claimed the plywood from the trailer side kits came from "up the road." He contended that he was going to use it to roof a barn.

## II. Procedural History

On August 1, 1991, a federal grand jury returned a six-count indictment in which Burnette was charged in Counts Two, Four, Five and Six with aiding and abetting the knowing possession of, and knowingly possessing, stolen goods in interstate commerce; and in Count Three with aiding and abetting the theft of goods in interstate commerce—all in violation of 18 U.S.C. §§ 2, 659 (1988). On August 7, 1991, Burnette appeared for arraignment and entered pleas of not guilty to all counts.

The trial began on September 17, 1991. The case was submitted to the jury on September 18, 1991. The same day, the jury found Burnette guilty on Counts Two, Four, Five and Six, and not guilty on Count Three.

A presentence investigation report (PSIR) was prepared pursuant to court order. On November 18, 1991, Burnette filed his objections to the PSIR. On December 6, 1991, a hearing was held on Burnette's objections. In the end, the district court imposed a sentence which included: four concurrent thirty-three-month terms of imprisonment; four concurrent two-year terms of supervised release; $92,209 in restitution; and a $200 mandatory special assessment.

Two levels of Burnette's total offense level of nineteen were imposed as an upward adjustment for obstruction of justice.

Burnette timely filed a notice of appeal.

## III. Standard of Review

We review determinations that a defendant has obstructed justice by committing perjury under a clear error standard. 18 U.S.C. § 3742(e) (1988); *United States v. Alvarez*, 927 F.2d 300, 303 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991); *United States v. Hamilton*, 929 F.2d 1126, 1130 (6th Cir.1991). In this case, however, the sentencing judge did not make such a determination. This appeal concerns whether a sentencing judge must do so in order to impose an obstruction of justice enhancement. Since this issue is a matter of law, we approach it *de novo. See United States v. Lozoya–Morales*, 931 F.2d 1216, 1218 (7th Cir.1991).

## IV. Obstruction of Justice

According to the United States Sentencing Commission's *Guidelines Manual* (Nov.1991) [hereinafter *Guidelines* ], a sentencing judge may increase (by two levels) the offense level for a given crime "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." *Guidelines* § 3C1.1. Application Note 3(b) to this section of the *Guidelines* specifically mentions "committing ... perjury" as an example of the type of conduct to which this enhancement applies.

The sentencing judge in the instant case increased Burnette's offense level pursuant to this provision of the *Guidelines*. The judge discussed the matter with counsel at the December 6, 1991 sentencing hearing:

> THE COURT: ... Then we have the obstruction of justice. And I know you've got an objection about that. And basically your objection there is he testified he didn't do any of that stuff.
>
> MR. HIBBARD (for Defendant): Yes, Your Honor. It's ...

878

THE COURT: You're kind of caught between a rock and a hard place; I understand that. But Mr. Burnette sat there at trial and said he didn't do it in the face of people coming in and saying "Yeah, that's the guy that was there. That's the guy that brought this stuff up here to Louisville to be cut up." Didn't he?

MR. HIBBARD: Yes, Your Honor. But I feel that the obstruction of justice enhancement should be applied—And I have some problem with it even being applied at all to someone's testimony in their own defense. But if it is to be applied, I feel it should be restricted to situations—and some of the cases I think have followed this line—where the testimony is so contrary to that of credible witnesses. Where you have five undercover FBI agents that testified that this individual—

THE COURT: That guy from the Louisville—The guy that owned that Louisville scrap yard, he didn't have any dog in that fight at all, did he? I mean, he had no reason to—I understand Dooley said he was involved in it. Adams said he was involved in it but, you know, they had some reasons, you pointed that out, where it might—

MR. HIBBARD: I don't recall anything that the gentleman from the scrap yard in Louisville testified to that Mr. Burnette denied. Mr. Burnette never denied that he transported this aluminum to the various places that it was alleged that it was transported to. He didn't deny that. He simply denied that—His testimony was that he was hired to haul this aluminum.

THE COURT: Hired to cut up those big rolls of aluminum down there in Laurel County and didn't have any idea that they were stolen.

MR. HIBBARD: I don't believe that he testified he was hired to cut it up. I believe he testified that he wasn't involved in the cutting it up.

THE COURT: Well, but he had a little shed there where they cut it up and built it and things like that; a little bit more there than just said, "I didn't—I was

paid to do it." I understand your objection to it and I think the two-point addition for obstruction of justice is justified. J.A. at 216–18. Though the judge recited evidence suggesting that he believed that Burnette lied, he made no specific finding in this regard. We hold that the judge erred in enhancing Burnette's sentence for obstruction of justice without making such a finding.

Application Note One to *Guidelines* § 3C1.1 states that the obstruction of justice enhancement is "not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) ... is not a basis for application of this provision." In line with this, several circuit courts have held that a defendant may not be found to have "obstructed justice" merely because he or she testifies at trial and the jury returns a guilty verdict. *See United States v. Martinez,* 922 F.2d 914, 926 (1st Cir.1991) ("to hold that a jury's verdict of guilty beyond a reasonable doubt on the basis of evidence which was in direct conflict with a defendant's testimony signals perjury would in effect amount to punishing a defendant for exercising his right to take the witness stand in his own defense"); *Lozoya–Morales,* 931 F.2d at 1219 ("Imposing a penalty automatically from a jury verdict that concededly does not establish the defendant lied in his testimony impinges upon the right to testify in one's behalf."); *United States v. Willis,* 940 F.2d 1136, 1140 (8th Cir.1991) ("The [obstruction of justice] adjustment cannot be given simply because a defendant testified in his own behalf and the jury disbelieves him."), *petition for cert. filed,* No. 91–6696 (Dec. 9, 1991). As the Fourth Circuit has written:

[S]entencing judges should not indiscriminately treat as a perjurer every convicted defendant who has testified in his own defense. Witnesses induced by sordid motives or fear have been known to fabricate accusations with such guile that even conscientious triers of fact have been misled. Moreover, some essential elements of proof of criminal conduct,

such as knowledge, intent, malice, and premeditation are sometimes so subjective that testimony about them cannot be readily categorized as true or false. Judges must constantly bear in mind that neither they nor jurors are infallible. A verdict of guilty means only that guilt has been proved beyond a reasonable doubt, not that the defendant has lied in maintaining his innocence.

*United States v. Moore,* 484 F.2d 1284, 1287–88 (4th Cir.1973).

 The right to testify at trial, however, does not include a right to commit perjury. *United States v. Acosta–Cazares,* 878 F.2d 945, 953 (6th Cir.), *cert. denied,* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989). Circuit courts have thus upheld a sentencing judge's conclusion that justice was obstructed where the judge makes a *specific finding* that a defendant lied. *See, e.g., Alvarez,* 927 F.2d at 302 (upholding obstruction of justice enhancement upon the district court's factual finding that the defendant, under oath, "did, indeed, lie"); *Hamilton,* 929 F.2d at 1130–31 (upholding obstruction of justice enhancement where district court "made a credibility finding that the defendant 'has told one bare-faced lie after another during his sentencing proceedings ...'"); *United States v. Head,* 927 F.2d 1361, 1372 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991) (upholding obstruction of justice enhancement where district court found that "the sum total of [defendant's] testimony on [certain] issues was not truthful and that [defendant] did in fact lie ..."); *Willis,* 940 F.2d at 1140 (upholding adjustment for obstruction of justice where district court had stated: "[a]fter a thorough review of the facts of this case, the Court concludes that the defendant's testimony was, at least in part, false"); *United States v. Morgan,* 936 F.2d 1561, 1574 (10th Cir.1991) (upholding obstruction of justice enhancement where district court found defendant to have uttered "a fabrication and an untruth ... [the defendant] lied ..."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992); *United States v. Husky,* 924 F.2d 223, 225 (11th Cir.) (affirming obstruction of justice enhancement because "the district court made an independent finding" that defendant testified falsely), *cert. denied,* —— U.S. ——, 112 S.Ct. 111, 116 L.Ed.2d 81 (1991); *United States v. Dyer,* 910 F.2d 530, 533 (8th Cir.) (obstruction of justice enhancement upheld where "the District Court found [certain testimony of defendant] was a lie"), *cert. denied,* —— U.S. ——, ——, 111 S.Ct. 276, 366, 112 L.Ed.2d 232 (1990).

This specific finding need not be as detailed as "reasoned statements" justifying *departures* from the *Guidelines. See United States v. Beaulieu,* 900 F.2d 1531, 1535–36 (10th Cir.), *cert. denied,* 497 U.S. 1009, 110 S.Ct. 3252, 111 L.Ed.2d 762 (1990); *United States v. Mejia–Orosco,* 867 F.2d 216, 221 (5th Cir.), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989); *United States v. Duque,* 883 F.2d 43, 44–45 (6th Cir.1989). But 18 U.S.C. § 3553(c) (1988) directs that the sentencing judge "shall state in open court the reasons for its imposition of the particular sentence." At a minimum, then, if an obstruction of justice enhancement is to be given for false testimony, we require the sentencing judge, who has the unique "opportunity ... to judge the credibility of the witnesses," 18 U.S.C. § 3742(e), to make a clear finding that the defendant has lied with respect to testimony given under oath. *See Willis,* 940 F.2d at 1140 (the "district court itself must find that the defendant committed perjury before making the upward adjustment" for obstruction of justice); *Lozoya–Morales,* 931 F.2d at 1219 ("The [obstruction of justice adjustment], absent an independent finding by the District Court that [the defendant] lied, is improper. In our view, the District Court, based upon its observations of [the defendant's] testimony and other evidence, must independently determine whether the defendant lied on the witness stand.").

Since the sentencing judge in the instant case made no such clear finding, we find insufficient grounds for an obstruction of justice enhancement to Burnette's sentence. Thus, we reverse the sentence im-

posed, and remand for resentencing in accordance with this opinion.