4 F.3d 995
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee and Cross-Appellant,
v.
Danny STOKES and Terry Bailey, Defendants-Appellants and
Cross-appellees.
 Nos. 91-2001, 91-2059, 91-2072 and 91-2073.
 United States Court of Appeals, Sixth Circuit.
 Aug. 17, 1993.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, No. 90-80304, Gilmore, J.
 E.D.Mich.
 AFFIRMED.
 BEFORE: RYAN and BOGGS, Circuit Judges; and ECHOLS, District Judge.[1]
 PER CURIAM.
 
 
 1
 The defendants were convicted on multiple counts of drug-related offenses. They now raise numerous assignments of error. The government also appeals the district court's refusal to increase the defendants' sentence based upon obstruction of justice. For the reasons stated, we affirm.
 
 
 2
 * In January 1990, DEA agents in Los Angeles, California arrested Pete Moore for possession of controlled substances with intent to distribute. Agents debriefed Moore regarding his role in illegal narcotics trafficking between California and Detroit. He agreed to cooperate in return for a reduced sentence. Moore admitted that he supplied drugs to dealers in Detroit. Specifically, he claimed that he worked with Danny Stokes and Terry Bailey, and that he would introduce the agents to these two dealers.
 
 
 3
 Moore arranged for DEA agents to meet with Stokes and Bailey so that DEA agents could perform an undercover sting operation. At the first meeting, only Stokes met with the undercover agents. DEA agent Neville, posing as a dealer, rented a room at the Radisson Inn at the Detroit Airport. At the meeting, Stokes agreed to purchase six kilos of cocaine from Neville for $19,000 a kilo. Stokes said that Bailey would raise the funds. Several days later, Neville met with both Stokes and Bailey, and the three men ironed out the deal.
 
 
 4
 On April 3, 1990, a third meeting was held, this time at the Embassy Suites Hotel in Southfield, Michigan. Only Stokes and Neville were present. Further changes in the deal were made. Stokes finally agreed to purchase eight kilos of cocaine, and Neville agreed to give him two kilos on credit. Stokes made some calls, and told Neville that Bailey and another co-defendant, Bobby Wade, would be arriving with the cash. When Stokes, Bailey, and Wade were in the room with the money, police entered and arrested them. Defendant Wade had physical possession of the $127,000 in cash at the time of the arrest. Every meeting between the appellants and the DEA agents was videotaped.
 
 
 5
 The case proceeded to trial against Stokes, Bailey, and four co-defendants in 1991.[2] A four-week jury trial was held. Out of the six co-defendants, only Stokes and Bailey were convicted. Stokes was convicted of three counts: 1) conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. Secs. 841 and 846; 2) unlawful use of a communication facility, in violation of 21 U.S.C. Sec. 843(b); and 3) attempted possession of cocaine with intent to distribute, in violation of 21 U.S.C. Secs. 841 and 846. Bailey was found guilty on the first two counts and not guilty on the third count. Stokes received 188 months' imprisonment on counts one and two, to run concurrently with a 48-month sentence on count three, and five years' supervised release. Bailey was sentenced to 168 months' imprisonment on count one, and 48 months on count three, to be served concurrently. Bailey also received five years' supervised release.
 
 
 6
 Stokes and Bailey then brought these timely appeals. They argue that: they were entrapped as a matter of law; the jury instructions were improper; there is insufficient evidence to support the verdict; and juror misconduct requires a mistrial. Stokes also argues that the court improperly refused to allow two of his witnesses to testify. Bailey independently argues that insufficient evidence exists to sustain his conspiracy conviction. The government cross-appealed on the issue of whether the defendants should have received obstruction of justice enhancements.
 
 II
 
 7
 Both Stokes and Bailey assert that they were entrapped as a matter of law. The district court submitted the issue to the jury, and the argument was necessarily rejected. Both defendants then filed motions for judgment of acquittal pursuant to Fed.R.Crim.P. 29(c), raising the issue of entrapment. The district court denied these motions, and the argument has now been renewed on appeal.
 
 
 8
 The Supreme Court has recognized that "the question of entrapment is generally one for the jury, rather than for the court." Matthews v. United States, 485 U.S. 58, 63 (1988). In United States v. Silva, 846 F.2d 352, 355 (6th Cir.), cert. denied, 488 U.S. 941 (1988), this court stated that an entrapment as a matter of law defense must show a patently clear case of lack of predisposition, and the evidence must be taken in the light most favorable to the government. A court cannot chose between conflicting testimony or make credibility determinations.
 
 
 9
 Neither appellant has satisfied this standard. Moore told DEA agents that he had been shipping drugs to Stokes and Bailey for years. Moore set up a meeting, at which time Stokes met with the agents who were posing as drug dealers. At this meeting, Moore told Stokes that there was a great deal of "heat" on him, and so he could not meet their usual demands. Stokes expressed no reluctance in dealing with the agents. Terms were discussed, and a deal was made. Throughout the meeting, Stokes referred to Bailey as his partner, and Stokes discussed his and Bailey's dealings together.
 
 
 10
 A second meeting was held. This time both Stokes and Bailey were present. During the discussion, Stokes and Bailey told the agent that: 1) Bailey recently had graduated from Western Michigan University, and he had operated that branch of the drug operations; 2) Stokes previously had dealt drugs in Atlanta, Georgia; and 3) Bailey was leery about doing the deal in Southfield, Michigan because of a bad drug dealing experience in that town.[3] Throughout the negotiations, both Stokes and Bailey stated that they were in a hurry to consummate a deal so that they could "get back in business." Finally, Stokes had been arrested in January 1990 with 3 grams of cocaine. He pled guilty to this offense only two weeks before his arrest on these charges. At the time of the instant trial, charges were pending against Bailey in state court for possession of 13 grams of cocaine. Based upon this overwhelming evidence, we reject the appellants' position.
 
 III
 
 11
 Both defendants argue that the court's entrapment instruction was error. Appellants base their position on United States v. Lasuita, 752 F.2d 249 (6th Cir.1985). In that case, the jury asked the court:
 
 
 12
 Does the government have to prove, beyond a reasonable doubt, that prior to contact with the U.S. Government or its agents, that the Defendant was ready and/or willing to enter into an illegal act?
 
 
 13
 Id. at 252. Over the objection of the defendant's counsel, the court answered "No." We held that this answer was incorrect, as the government does have to prove predisposition prior to contact with the government. Id. at 253. In the present case, the district court offered the following instruction regarding the defendant's burden of proof for the entrapment defense:
 
 
 14
 It must be shown that the defendant was not already willing to commit the crime before the government became involved.... In deciding whether the defendant was already willing to commit the crime you may ask yourselves: Did the defendant engage in similar activity with others either before or after he became involved with the government agent....
 
 
 15
 Appellants contend that this instruction, specifically the last sentence, was error because it gave the impression that the defendants need not have a predisposition to commit a crime. According to the defendants, this last sentence directly contravenes Lasuita's requirement that the government prove predisposition.
 
 
 16
 Because appellants never raised this issue below, we must review under the plain error standard. United States v. Sanchez, 928 F.2d 1450, 1456 (6th Cir.1991). Plain error review is discretionary, and used solely in those situations where a miscarriage of justice would otherwise result. Finch v. Monumental Life Ins. Co., 820 F.2d 1426 (6th Cir.1987). Plain errors are those "which are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988). In this case, appellants' asserted error does not rise to the level of plain error, as absolutely no error was made.
 
 
 17
 The contested portion of the jury instruction tracks the language of the Sixth Circuit Pattern Criminal Jury Instruction 6.03 ("ask yourself if the defendant took part in any similar criminal activity with anyone else before or afterwards...."). This instruction in no way undermines Lasuita. Rather, the instruction concerns only the evidence that may be considered when answering the question posed in Lasuita: whether predisposition existed before the crime. In answering this question, a jury may look at evidence of the defendant's character both before and after his arrest. Ex post evidence is relevant because it may shed light on whether defendant is the type of person who could commit the crime in question. Accordingly, no error was made.
 
 IV
 
 18
 One of the potential jurors, Linda Parizon, told the court during voir dire that she could not be a fair juror. She did not think it was right that the defendants could get life imprisonment, and she did not want to be responsible for what happened to the defendants.[4] Parizon then reported to the trial court that she had overheard another prospective juror, Allie Davis, telling other prospective jurors that she, Allie Davis, had seen one of the defendants "selling drugs on the corner." Parizon conjectured that 5 to 10 prospective jurors heard the comment.
 
 
 19
 The trial judge noted that he thought Parizon concocted the story so that she could avoid jury duty. However, in order to insure a fair jury, the court asked the remaining potential jurors whether they had heard any statement concerning any of the defendants. Only one person answered in the affirmative. This potential juror said that Davis had commented that she recognized defendant Blevins.[5] However, the reference had been "vague," and Davis had said that she could not remember how she knew him. The court then questioned Davis in chambers. She stated that she thought that she recognized Blevins, but she could not remember how she knew him, and that she had not said anything more specific to the other potential jurors. The court then struck Davis, Parizon, and the prospective juror who had heard Davis's comments. Voir dire continued, and a jury eventually was selected.
 
 
 20
 Appellants now argue that it was error not to declare a mistrial and strike the entire panel. This argument is meritless. The burden is on the defendants to show that any unauthorized communication involving jurors resulted in actual juror partiality. United States v. Pennell, 737 F.2d 521, 532 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985). This issue is committed to the sound discretion of the trial court. United States v. Knipp, 963 F.2d 839 (6th Cir.1992). A trial court's decision on this issue will not be disturbed unless there is a clear abuse of discretion. Ibid.
 
 
 21
 In the present case, there absolutely is no evidence of actual juror prejudice. Appellants cite cases where jurors who actually determined guilt heard prejudicial comments. Leonard v. United States, 378 U.S. 544 (1964) (where prosecutor improperly told jury that defendant had previously been convicted of similar crime, mistrial was proper). However, in the present case, no member of the jury reported hearing any prejudicial comments. Moreover, it appears any comment made was minor. Davis only said that she recognized one of the defendants.[6] This defendant is not even one of the appellants. For these reasons, we reject the appellants' position.
 
 V
 
 22
 The defendants argue that the district court committed reversible error by refusing to give a "missing witness" instruction concerning Pete Moore. Moore did not testify because he was testifying in California against his suppliers at the same time. Bailey and Stokes now argue that a "missing witness" instruction should have been given. Pursuant to such an instruction, the court would instruct that the failure of the government to call Moore leads to an inference that, had the witness been produced, his testimony would have been adverse to the government. See United States v. Frost, 914 F.2d 756, 765 (6th Cir.1990).
 
 
 23
 This argument is frivolous. From the beginning, the government stated that it did not plan to call Moore because he was needed in California. The district court stated that, "if any defense attorney wants him, let the Court and Mr. Stern [the prosecutor] know fairly quickly," and the court would subpoena him. The prosecutor then stated that he would be happy to transfer Moore at the request of the defendants. The defense attorneys all affirmatively stated that they did not wish to call him.
 
 
 24
 Several times thereafter, defense counsel made cutting remarks in front of the jury regarding Moore's failure to testify, and what that said about the government's case. Each time the district court reprimanded defense counsel, and made very clear that the court gladly would subpoena Moore. Each time, the defendants declined. Given these facts, the request of a "missing witness" instruction is baseless. Id. at 765 (a "missing witness" instruction requires a showing that the missing witness was beyond the reach of the party requesting the instruction).
 
 VI
 
 25
 Bailey argues that insufficient evidence exists to sustain his conspiracy conviction. Upon reviewing a verdict for sufficiency of the evidence, "[I]t is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). More recently, the Court has stated that, provided that sufficient evidence exists for a rational trier of fact to reach the stated verdict, the court must affirm. Jackson v. Virginia, 443 U.S. 307, 330 (1979).
 
 
 26
 According to Bailey, he was not at the meeting between DEA agents and Stokes when the terms were finalized. For this reason, he contends that he cannot be considered a member of a conspiracy. This position is incorrect. Stokes made clear at the first meeting that he and Bailey were partners. At subsequent meetings, Bailey was present, and he took part in negotiations that resulted in a modification of the original agreement. On the stand, Bailey admitted that he took an active role in negotiations. Bailey also played an active role in the actual purchase of the drugs. He obtained the money, and was present at the time of the purchase. Accordingly, we reject his argument.
 
 VII
 
 27
 Stokes also argues that the court improperly refused to allow two of his witnesses to testify. After opening arguments, the attorneys and the court agreed to a sequestration order. Upcoming witnesses were not allowed in the courtroom. Rule 615, Fed.R.Evid., allows for such an order at the request of a party. During the presentation of Stokes's case, his attorney attempted to call a representative of Chrysler Credit Corporation and appellant's landlady. The trial court did not allow them to testify, based upon violation of the sequestration order. Appellant concedes that these witnesses violated the order, however, but he contends that the punishment was too severe.
 
 
 28
 A district court has broad discretion in determining the appropriate remedy for a party's violation of a sequestration order, and that remedy may include prohibiting the witness from testifying. United States v. Gibson, 675 F.2d 825, 836 (6th Cir.), cert. denied, 459 U.S. 972 (1982). Review of the district court's decision is limited to a determination of whether the court abused its discretion. Ibid. In the present case, the witnesses undeniably violated the order, and appellant has not shown that the court abused its discretion. Moreover, the testimony was essentially irrelevant. Both witnesses would have testified about Stokes's desperate financial situation, implying he was thus unwillingly seduced into the transaction. Stokes had other witnesses testify as to his dire financial situation. Also, the evidence was overwhelming that Stokes required no seducing whatsoever. He willingly entered into the transaction. Accordingly, any error was harmless. Fed.R.Crim.P. 52(b).
 
 VIII
 
 29
 The government cross-appeals the district court's refusal to grant a two-level increase for obstruction of justice. In its sentencing memorandum, the government detailed the alleged lies both defendants told while on the stand. At the hearing, the court refused to increase the sentence. The court gave two different explanations for its ruling. First, the court stated that, although the defendant's testimony was implausible, it did not rise to the level of perjury. Second, the district court expressed fear regarding the chilling effect on testifying that the increase might have.
 
 
 30
 The government contends that reversal is required based upon United States v. Dunnigan, --- U.S. ----, 113 S.Ct. 1111 (1993). In that case, the Court held that an increase for obstruction of justice when the defendant lies on the stand is proper. With this ruling, the Court made clear that the commission of perjury during a criminal trial necessities a two-level enhancement. The government asks that we require the district court to impose a two-level increase because the district court's concerns about the potential chilling effect are no longer valid in light of Dunnigan.
 
 
 31
 We reject the government's position. The government is correct that Dunnigan negates the court's concerns about chilling a defendant's testimony. However, before finding obstruction of justice, the district court must make a factual finding that the defendants committed perjury. United States v. Burnette, 981 F.2d 874 (6th Cir.1992). The district court emphatically refused to make this finding. The court stated that their testimony was "implausible," but did not rise to the level of "perjury." Perjury requires that the court find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony...." Dunnigan, --- U.S. at ----, 113 S.Ct. at 1116. Taking the evidence before the trial court in the light most favorable to the defendants, the government has not shown that the trial court's factual finding of no perjury was clearly erroneous.
 
 
 32
 For the reasons stated, we AFFIRM the convictions and sentences of Bailey and Stokes.
 
 
 
 [1]
 The Honorable Robert L. Echols, United States District Court Judge for the Middle District of Tennessee, sitting by designation
 
 
 [2]
 There originally were seven co-defendants. However, Bobby Wade pled guilty prior to trial
 
 
 [3]
 13 kilos of cocaine had been lost when a maid unexpectedly entered their hotel room and discovered the drugs
 
 
 [4]
 The district court tried to explain that the defendants could not get life imprisonment, but Parizon did not appear to be listening
 
 
 [5]
 Blevins was one of the defendants who was acquitted
 
 
 [6]
 Based upon Ms. Parizon's clear desire to avoid jury duty, the district court chose not to believe her version of what transpired. The fact that Davis and the other prospective juror told identical stories supports the district court's finding that Parizon was not telling the truth, and that the comment was minor