16 F.3d 1223
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Tina Marie VIRTA, Victor Pennell, Oscar Virta, Jr., Timothy
Galbraith, and Paul Mousseau, Defendants-Appellants.
 Nos. 92-2343, 92-2443, 93-2453, 92-2454, 92-2471.
 United States Court of Appeals, Sixth Circuit.
 Jan. 21, 1994.
 
 Before: NELSON and BATCHELDER, Circuit Judges, and MATIA, District Judge.[1]
 PER CURIAM.
 
 
 1
 The defendants in this case, who were convicted of participation in a drug conspiracy, raise numerous challenges to their convictions and sentences. For the reasons explained herein we shall affirm the convictions.
 
 
 2
 The sentences will likewise be affirmed, except for those of defendants Paul Mousseau and Victor Pennell; their cases will be remanded for resentencing. The cases of defendants Tina and Oscar Virta will also be remanded, thereby affording the district court an opportunity to consider whether the Virtas ought to be resentenced in light of a recent amendment to the United States Sentencing Guidelines.
 
 
 3
 * The defendants were arrested on February 10, 1992, when federal and state agents broke up a wide-ranging conspiracy to distribute marijuana and LSD in the area of Alpena, Michigan. Undercover officers penetrated the conspiracy in the latter part of 1991. An informant purchased LSD from defendant Paul Mousseau in Alpena on November 8, 1991, and again on December 8 of that year. The same informant bought twelve doses of LSD from defendant Oscar Virta on January 12, 1992, and eight doses 12 days later. On one of these occasions Mr. Virta said that he could get nearly one hundred more doses of LSD.
 
 
 4
 Mr. Virta sold cocaine to a second informant in December of 1991, and on January 27, 1992, he offered to sell this informant some two hundred "hits" of "acid" (LSD). The offer of this much LSD led the informant to introduce Virta to "Bob Stafford," who was actually Sgt. Charles Sobczak, of the Sheriff's Department of Alpena County, working under cover. Mr. Virta and his wife, defendant Tina Marie Virta, were reluctant to sell the 200 hits of LSD to a stranger, but after being reassured that "Bob" was "cool," Mr. Virta sold him the LSD for eight hundred dollars. Mr. Virta indicated that he had been dealing in LSD for more than a year, and that he obtained 100 or 200 hits once or twice a week from a source in Lansing who brought it to him in Bay City. If Sgt. Sobczak would agree to buy larger quantities of LSD, Mr. Virta told him, Virta would lower the per-dose price.
 
 
 5
 On January 28, 1992, the second informant told Mr. Virta that "Bob" wanted more LSD. The informant arranged for Sgt. Sobczak to drive Mr. Virta to Bay City to receive the LSD from Mr. Virta's source, but Virta had the sergeant drive him to Lansing instead. During the trip Mr. Virta said that his wife had arranged the pending transaction, and that his LSD supplier was Mrs. Virta's uncle, defendant Tim Galbraith.
 
 
 6
 When they got to Lansing, Sgt. Sobczak and Mr. Virta met Tim Galbraith in the parking lot of the Pig Pit restaurant. There Virta paid Galbraith $1,100--using bills that Sgt. Sobczak had given him--for 300 doses of LSD. Mr. Virta then passed the LSD on to Sgt. Sobczak.
 
 
 7
 The second informant went to the Virtas' house a few days later to make arrangements for another sale to "Bob." During the visit Tina Virta told the informant that she had called her uncle, Tim Galbraith, to tell him that she had known "Bob" for two years and that it was safe to sell LSD to him. The next day Sgt. Sobczak drove Mr. Virta and the informant to a store in Bay City where Mrs. Virta's sister, Tricia Dubay, worked. Tim Galbraith met them in the parking lot of the store and sold them 600 hits of LSD. Virta paid for half of this amount with $1,100 given him by Sgt. Sobczak, and he promised to pay for the balance later. Mr. Virta told Sgt. Sobczak on this occasion that he expected to be able to supply him with 500 to 1,000 doses of LSD per week in the future.
 
 
 8
 A final transaction occurred on February 10, 1992, pursuant to "Bob's" request that Mr. Virta arrange a purchase of 500 hits from Mr. Galbraith. Sgt. Sobczak and Mr. Virta drove to Bay City, where Virta called Tricia Dubay and received directions to the trailer park where she lived. Sgt. Sobczak gave Virta marked bills in the amount of $2,700 to pay for the 500 dose purchase and for the 300 doses previously purchased on credit.
 
 
 9
 Sgt. Sobczak drove Mr. Virta to a point near the trailer park, where Virta got out of the car. The sergeant waited for him at a gas station. Mr. Virta showed up at the gas station in a car driven by Ms. Dubay, and the two of them were arrested by a team of government agents. Other officers stopped a car driven by Mr. Galbraith; he too was arrested, as was his passenger, defendant Victor Pennell. Police officers recovered the $2,700 that Sgt. Sobczak had given Mr. Virta earlier; $400 was in Mr. Virta's wallet, and $2,300 was in Mr. Galbraith's car.
 
 
 10
 Search warrants were executed on February 10 at the Virtas' residence in Alpena, at Ms. Dubay's trailer in Bay City, and at Mr. Galbraith's residence in Lansing. The search of the trailer turned up several marijuana plants, while ten doses of LSD were found in Mr. Galbraith's home.
 
 
 11
 As government agents were in the process of searching the Virta house, Mrs. Virta returned home. After being told that her husband had been arrested, and in response to questioning by the agents, she admitted that her husband had sold marijuana, cocaine and LSD from their house, and that she had used the telephone at her parents' house to arrange narcotics transactions.
 
 
 12
 The five appellants and Ms. Dubay were indicted on charges of conspiracy, possession of LSD with intent to distribute it, and use of a communications facility for illegal narcotics transactions. A sixteen-count superseding indictment was handed up on May 19, 1992.[2]
 
 
 13
 The case went to trial at the beginning of June. On the first day of trial Messrs. Galbraith and Virta entered into plea agreements pursuant to which they both pleaded guilty to the conspiracy count. The charges against the remaining defendants were tried to completion, and the jury returned verdicts of guilty on all counts. Mr. Galbraith was sentenced to 240 months' imprisonment, Mr. Virta to 150 months, Mrs. Virta to 120 months, Paul Mousseau to 135 months, and Victor Pennell to 180 months. Except for Ms. Dubay, all the defendants filed timely notices of appeal.
 
 II
 
 14
 * We turn first to a contention by Mrs. Virta that the trial court erred in refusing to suppress the statements she made when her house was searched. She argues that this evidence should have been suppressed under Miranda v. Arizona, 384 U.S. 436 (1966), because the officers questioned her without first having advised her of her rights. On the facts as found by the district court, we conclude that the overruling of Mrs. Virta's motion to suppress was not erroneous.
 
 
 15
 The requirements of Miranda do not extend to all situations in which police officers interact with citizens; the requirements apply, rather, where the circumstances suggest a particular danger that officers will use oppressive tactics to coerce statements from suspects. A person must be informed of his rights (including his right to remain silent) only when he is "under arrest" or when his freedom of action has been curtailed to a degree normally associated with a formal arrest. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). Whether someone is under arrest or quasi-arrest for Miranda purposes depends on how a reasonable person in the suspect's position would have understood his situation. Id. at 442.
 
 
 16
 It is undisputed that Mrs. Virta was not in fact under arrest when she made her statements to the police officers who were searching her house. It is further undisputed that the officers did not inform her of her Miranda rights. To decide whether the rule of Miranda was violated, we must determine whether a reasonable person in Mrs. Virta's situation would have believed her freedom of action to be curtailed to the degree associated with a formal arrest. After taking testimony at a suppression hearing, the district court found that her freedom was not curtailed to such an extent. We apply a "clear error" standard in reviewing the district court's findings as to what took place; the court's application of the law is reviewed de novo.
 
 
 17
 Mrs. Virta and Agent Christopher Hackbarth of the U.S. Drug Enforcement Administration were the sole witnesses at the suppression hearing. Mrs. Virta testified that several agents were in the process of searching the residence when she arrived home. She said that Agent Hackbarth told her she was "detained" to a chair in the living room until the agents finished their search, and that she was so detained for more than an hour. (Agent Hackbarth denied that Mrs. Virta had been told she was detained, and the trial court believed the agent on this.) Mrs. Virta admitted that the agents told her that she was not under arrest, but she said that she did not feel free to leave the room or the house. She testified that the police threatened her with arrest, and that they said her children could be taken from her if she were sent to jail. It was only after she had been thus threatened, she said, that she told the agents that her husband had been selling drugs from their house, that her uncle Tim Galbraith was her husband's source for LSD, and that she had arranged some of their transactions. Under cross-examination she admitted that the officers allowed her to move about the house after she had been there for fifteen minutes. She also admitted that she was permitted to go to the back door to give her mother-in-law a diaper and a baby's bottle. She did not attempt to leave the house, and she did not request permission to leave.
 
 
 18
 Agent Hackbarth and Mrs. Virta both testified that she was questioned intermittently during the search and that the questioning was not of a sustained duration. All told, the questioning took up no more than ten minutes of the time the agents were present. Agent Hackbarth specifically denied that Mrs. Virta was ever told that she was "detained" to a chair in the living room. Discrediting Mrs. Virta's testimony on that score, the trial court found that her situation was not the functional equivalent of an arrest. The circumstances did not bear the hallmarks of arrest, the court observed, in that she was neither physically restrained nor threatened, she was free to move about the house and communicate with her mother-in-law, and she was told specifically that she was not under arrest.
 
 
 19
 We cannot say that the trial court's factual findings were clearly erroneous--and we agree that the Miranda rule was not triggered under the circumstances found by the court. We note, in this connection, that other appellate courts have refused to invoke Miranda in situations where a suspect was asked to remain in one portion of a structure while a search was being executed. See United States v. Jones, 933 F.2d 807, 810 (10th Cir.1991); United States v. Fazio, 914 F.2d 950, 955 (7th Cir.1990); United States v. Hocking, 860 F.2d 769, 773 (7th Cir.1988).
 
 
 20
 Nothing in United States v. Mahar, 801 F.2d 1477 (6th Cir.1986), requires a different conclusion. In Mahar twenty police officers had entered the building with weapons drawn and made the defendant stand with his hands against the wall for twenty minutes; the defendant was struck when he spoke to the person next to him; the defendant was not allowed to move about the room; and the defendant was not told that he was not under arrest. Id. at 1499-1500. The differences between that case and this are obvious.
 
 B
 
 21
 Mrs. Virta also argues that the district court erred in admitting evidence of statements made by her husband to Sgt. Sobczak and the informer during their trip from Alpena to Lansing on January 29. Mr. Virta was said to have told the two men that his wife had arranged the purchase with her uncle, Tim Galbraith, and that her family connections were central to the entire criminal enterprise. The trial court let this in under Rule 801(d)(2)(E), Fed.R.Evid., which provides that statements made by a co-conspirator "during the course and in furtherance of the conspiracy" are not hearsay. Mrs. Virta contends that the statements could not have been made "in the course" or "in furtherance of" the conspiracy because they were made to an undercover agent and an informant who were both on the right side of the law.
 
 
 22
 This court has heretofore held that statements made to a person who is cooperating with the police, unbeknownst to the conspirator, may be admitted pursuant to Rule 801(d)(2)(E). United States v. Hamilton, 689 F.2d 1262, 1269 (6th Cir.1982), cert. denied, 459 U.S. 1117 (1983). And, as the government argues, statements made to encourage participation in a conspiracy or to identify a person as the source of the narcotics distributed through the conspiracy are classic examples of statements made "in furtherance of" the conspiracy. United States v. Rios, 842 F.2d 868, 874 (6th Cir.1988), cert. denied, 488 U.S. 1031 (1989).
 
 C
 
 23
 Mrs. Virta further contends that the evidence adduced at trial was not sufficient to support her conviction. This contention is based largely on the propositions that her statements during the search should have been suppressed and that her husband's statements to Sgt. Sobczak and the informer should not have been admitted. Because we have concluded that the statements by Mrs. Virta and her husband were properly admitted, the sufficiency-of-the-evidence argument fails. A reasonable jury could have found Mrs. Virta guilty on these statements alone.
 
 D
 
 24
 Prior to trial, Mrs. Virta moved that her trial be severed from the trial of her co-defendants. The district court denied the motion, noting that there is a presumption in favor of co-conspirators being tried together and that Mrs. Virta could point to no exigent circumstances justifying severance. She argues that the court erred, to her prejudice, because most of the evidence presented at trial was directed at her co-conspirators and because she could not subpoena the co-defendants to testify on her behalf.
 
 
 25
 This court was presented with a similar argument in United States v. Warner, 971 F.2d 1189 (6th Cir.1992), another drug conspiracy case. We observed there that "persons indicted together should be tried together," as a general rule, noting that a showing that a defendant would have a better chance of being acquitted if tried alone does not establish the degree of prejudice needed to justify severance. Id. at 1196. To show entitlement to a severance, the defendant must make a strong showing that failure to sever would result in specific and compelling prejudice. Prejudice is not established simply because the proof is greater against a co-defendant, or because a co-defendant has a criminal record and the movant has none. Id.
 
 
 26
 In the case at bar the trial court invited Mrs. Virta to show by affidavit that Messrs. Virta and Galbraith would give testimony favorable to her if she were tried separately. She submitted no such affidavits, and the court did not abuse its discretion in denying the requested severance.
 
 E
 
 27
 Mrs. Virta's final challenge to her conviction is based on the fact that the district court allowed Mr. Virta to invoke the marital privilege when he first testified at trial. Mr. Virta was the last witness to testify during the government's case-in-chief. The questions put to him by the prosecutor referred neither to his wife nor to her role in the conspiracy. When Mrs. Virta's counsel attempted to cross-examine Mr. Virta about his wife's conduct, Mr. Virta successfully claimed the marital privilege. Mrs. Virta now argues that this violated her Sixth Amendment right to confront adverse witnesses.
 
 
 28
 The point is not well taken. The proposed cross-examination was not within the scope of the direct examination, and Mrs. Virta was not prejudiced in any event. Mr. Virta testified on his wife's behalf later in the trial, answering every question posed to him by her lawyer. If the earlier ruling was erroneous--and we do not believe it was--this rendered it harmless.
 
 F
 
 29
 Paul Mousseau argues that the trial court committed prejudicial error in denying a motion for a mistrial during voir dire. In response to questioning from the court, a prospective juror stated (in front of other members of the venire) that "some years ago, a cousin of mine killed himself because somebody had laced a soft drink with LSD and he ended up committing suicide." The court subsequently excused this juror for cause, but Messrs. Mousseau, Virta and Galbraith moved for a mistrial nonetheless. In denying the motions the trial court expressed the view that the juror's comments were unlikely to inflame the minds of the other prospective jurors; it is common knowledge, the court observed, that illegal drugs are dangerous.
 
 
 30
 Decisions by a trial court on the seating of jurors are entitled to considerable deference, the trial judge being in the best position to read and evaluate the significance of what is really going on in the courtroom. See United States v. Garcia, 936 F.2d 648, 652 (2d Cir.), cert. denied, 112 S.Ct. 595 (1991). In the case at bar, giving due deference to the trial court's reading of the situation, we see no basis for doubting that the "possibility of real prejudice to the jury's impartiality" as a result of the prospective juror's statement "is too remote and speculative to support a reversal based on an abuse of discretion by the district court." See United States v. Knipp, 963 F.2d 839, 844-45 (6th Cir.1992) (finding no abuse of discretion in refusal to dismiss entire jury panel, where a prospective juror stated during voir dire that she knew one of the witnesses and would believe his testimony).
 
 G
 
 31
 Victor Pennell argues that the trial court erred in allowing the introduction into evidence of a photograph taken of Pennell at the time of his arrest. He claims that the photo should have been excluded as substantially more prejudicial than probative, see Rule 403, Fed.R.Evid., in that "it showed his distress and how he was dressed that day."
 
 
 32
 The government's theory is that Mr. Pennell was Mr. Galbraith's "enforcer." It introduced evidence from which the jury could have concluded that Pennell menaced Mr. Virta about his dealings with "Bob Stafford," who of course turned out to be an undercover officer. The government offered the photograph to show that Mr. Pennell cultivated an intimidating appearance, consistent with his alleged "enforcer" role. The trial court found the photo relevant, and observed that the depiction of Pennell was in no way "shocking or prejudicial." We do not believe that this decision represented an abuse of discretion. See United States v. Padin, 787 F.2d 1071, 1079 (6th Cir.) ("when a defendant appears at trial dressed in his Sunday best the prosecutor is entitled to show his appearance when arrested"), cert. denied, 479 U.S. 823 (1986).
 
 H
 
 33
 Mr. Pennell further argues that there was a prejudicial variance between the indictment and the proof brought against him at trial. He contends that while the indictment charged him with involvement in a conspiracy to distribute both LSD and marijuana, the proof at trial showed two separate conspiracies, one of which (the conspiracy to distribute marijuana) he had no connection with.
 
 
 34
 Where an indictment charges a single conspiracy, but the evidence at trial can reasonably be construed only as supporting multiple conspiracies, a "variance" exists. United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982). A single conspiracy is distinguished from multiple conspiracies by the presence of an "overriding scheme" and purpose by which all conspirators are joined in "a single, over-all, comprehensive plan." Blumenthal v. United States, 332 U.S. 539, 558-59 (1947). It is not necessary that each conspirator be aware of all facets of the conspiracy, but each must be "aware of the general nature and scope of the conspiracy and knowingly join[ ] in the overall scheme." United States v. Zimmerman, 832 F.2d 454, 458 (8th Cir.1987). "The fact that a conspiracy can be divided into distinctive subgroups does not mean that there is more than one conspiracy. As long as the different subgroups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy." Warner, 690 F.2d at 550 n. 8.
 
 
 35
 The government correctly notes that Mr. Pennell's argument seems predicated on the mistaken notion that the government was required to show his involvement with every aspect of the conspiracy. The proofs at trial demonstrated that Mr. Virta obtained both marijuana and LSD from Ms. Dubay in Bay City; that Ms. Dubay conducted a marijuana-growing operation in her trailer there; and that Messrs. Pennell and Galbraith regularly travelled to Bay City to deliver drugs to Mr. Virta with Ms. Dubay's assistance. Such evidence could reasonably have been taken to prove a single conspiracy to distribute two different kinds of drugs--and Mr. Pennell's involvement with Messrs. Galbraith and Virta and Ms. Dubay supports the conclusion that he knew of the "general nature and scope" of the overall criminal plan.
 
 
 36
 It is true that Mr. Pennell was not convicted for any conduct involving marijuana. A special jury verdict form indicated that he was found to have been involved only in the LSD operations of the conspiracy. But assuming arguendo that the special verdict lent support to the claim that there was a variance, it is clear that the verdict also showed that Pennell was not prejudiced by it, the jury not having convicted him for the activities of those involved in a separate marijuana conspiracy.
 
 
 37
 * Messrs. Pennell and Mousseau both argue that the evidence presented at trial was insufficient to support their convictions. These claims, too, are unpersuasive.
 
 
 38
 In reviewing the sufficiency of evidence underlying a conviction, we take the view of the evidence that is most favorable to the government. United States v. Head, 927 F.2d 1361, 1365 (6th Cir.), cert. denied, 112 S.Ct. 144 (1991). We do not weigh the credibility of the witnesses, but take "all of the evidence ... in the light most favorable to the prosecution." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The question to be decided is whether "any rational trier of fact could have found the essential elements of [the] crime beyond a reasonable doubt." Id. (emphasis in original).
 
 
 39
 To sustain a conviction for conspiracy under 21 U.S.C. Sec. 846, "the government must prove the existence of an agreement to violate the drug laws." It must also prove that each defendant "knew of, intended to join, and participated in the conspiracy." United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991). "The existence of a [defendant's] connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great." United States v. Betancourt, 838 F.2d 168, 174 (6th Cir.), cert. denied, 486 U.S. 1013 (1988).
 
 
 40
 We think that the evidence presented in the instant case was sufficient to sustain Mr. Pennell's conviction. The evidence indicates that Pennell drove with defendant Tim Galbraith from Lansing to Alpena on two or three occasions in late 1991 and early 1992 to deliver LSD to Galbraith's cousin, Donald Galbraith. On at least one occasion Mr. Pennell personally witnessed an LSD transaction between the Galbraiths. On one of the trips to Alpena, Pennell asked Donald Galbraith to sell some marijuana for him. On February 10, 1992, Pennell went to Ms. Dubay's trailer in Bay City with Tim Galbraith and met Oscar Virta. Mr. Virta passed money to Mr. Galbraith, and Mr. Pennell passed LSD to Mr. Virta. Pennell then interrogated Mr. Virta in a menacing manner about his association with "Bob Stafford." This evidence was sufficient to justify the conclusion that Mr. Pennell was a member of the conspiracy.
 
 
 41
 As for Mr. Mousseau, his argument rests on little more than an implicit assertion that the jury should have believed his testimony over that of three different witnesses who testified that they engaged in LSD transactions with him. The deficiencies of the argument are obvious.
 
 III
 
 42
 Each defendant argues that the district court erred in calculating his or her sentence. We turn to these arguments next.
 
 
 43
 * All of the defendants assert that the district court miscalculated the amount of drugs for which they were responsible, with the result that the court used incorrect offense levels in applying the sentencing guidelines. The district court's fact findings with respect to drug amounts must be upheld unless clearly erroneous. United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, 498 U.S. 906 (1990). The district court concluded that each conspirator had a base offense level of 32, the level for offenses involving ten to thirty grams of LSD. In sentencing the Virtas, Mr. Galbraith, and Mr. Pennell, the court added the amounts of LSD purchased by Sgt. Sobczak to the ten doses of LSD found in the search of Tim Galbraith's residence. This produced a total of slightly more than ten grams.
 
 
 44
 The four defendants argue, in essence, that the trial court should have accepted their versions of the quantity of narcotics with which they were associated, and that the court should not have held them accountable for drugs they did not handle individually. These arguments are not well taken as to the Virtas, because our review of the record persuades us that the court's estimates of the amounts attributable to the Virtas were conservative. We do, however, find that the district court committed clear error in calculating defendant Mousseau's sentence. We also find that the district court failed to make adequate findings in regard to defendant Pennell's "jointly undertaken criminal activity."
 
 
 45
 The trial court determined that as a member of the conspiracy Mr. Mousseau was responsible for more than 1600 doses of LSD over a thirteen-week period between October 1991 and January 1992. This calculation was based on Donald Galbraith's testimony before the grand jury and at trial--testimony which the court found to be credible. Donald Galbraith testified that over the course of this thirteen-week period Tim Galbraith supplied him with between one hundred and two hundred doses of LSD per week. Donald further testified that after consuming fifteen to twenty doses himself, he sold three-quarters of the remaining amount to Mr. Mousseau, his main distributor.
 
 
 46
 While acknowledging that he received LSD from Donald Galbraith on a weekly basis, Mr. Mousseau testified at his sentencing hearing that Donald sold him only twenty to thirty doses a week. Mousseau said he personally consumed half that amount, and that he would sell the remainder. On cross-examination, however, Mr. Mousseau acknowledged that if he consumed as much of the LSD as he claimed to have done every week, his sales of the remainder would not have generated enough revenue to pay for his weekly shipments. Mousseau admitted to not having another steady source of income, and when asked by the court where he got the money to make up his weekly deficit, he vaguely answered that he did "odd jobs" and borrowed money from friends. When asked to name three people for whom he performed odd jobs, Mr. Mousseau could not do so.
 
 
 47
 The trial court found Mr. Mousseau's testimony to be incredible. As the court noted, Donald Galbraith's version of his interactions with Mousseau was supported by aspects of Mousseau's own testimony, for Mousseau's admittedly heavy LSD habit required a regular source of income of the sort that would have flowed from his acting as Donald Galbraith's principal dealer. When Donald Galbraith was arrested in January of 1992, moreover, he was in possession of 180-190 doses of LSD, an amount consistent with what he testified Tim Galbraith supplied him with. Accepting Donald Galbraith's testimony, the court calculated that, over thirteen weeks, Donald supplied Mousseau with an average of 130 doses per week (150 doses received by Donald from Tim, less 20 doses retained by Donald for personal use). The court found that Mousseau had received 1690 doses of LSD from Donald Galbraith over this period, plus an additional 180 to 190 doses from Oscar Virta. The court thus charged Mr. Mousseau with responsibility for a total of 1870 to 1880 doses. Under the version of the Sentencing Guidelines then in effect, 1600 doses of LSD equalled 10 grams of the drug, and 10 grams was the threshold for offense level 32.
 
 
 48
 We are compelled to vacate Mr. Mousseau's sentence because the district court erred in calculating the amount of LSD that Mousseau received from Donald Galbraith. The court assumed that except for the 20 doses that Donald consumed every week, all of the LSD received by Donald from Tim Galbraith was passed on to Mr. Mousseau for distribution. The record does not support this assumption. In his testimony, which the court credited, Donald Galbraith stated that he sold only three-quarters of his remaining LSD to Mousseau; the remainder went to a woman named Bridgette, a secondary distributor. Nowhere in the record is there any evidence that Donald was giving Mousseau all the doses not consumed by Donald.
 
 
 49
 Recalculating the drug amount using the district court's findings, but accounting for the fact that Mousseau was not Donald Galbraith's sole distributor, we find that the amount of LSD did not reach the 1600 does threshold for offense level 32. Donald received an average of 150 doses per week from his cousin Tim, and consumed 20 doses per week himself. (The district court made findings of both these amounts, and the findings are not clearly erroneous.) Of the remaining 130 doses, he sold three-quarters, or 97.5 doses, to Mr. Mousseau, and the remainder to Bridgette. Over thirteen weeks, Mousseau thus received 1267.5 doses of LSD from Donald Galbraith. Adding to this the 180-190 doses which the court found Mousseau received from Mr. Virta, we get a total of no more than 1457.5 doses--which is below the 1600 dose threshold. Mr. Mousseau must therefore be resentenced under the appropriate offense level.
 
 
 50
 The trial court determined that as a member of the conspiracy Mr. Pennell was also responsible for more than 1600 doses of LSD. We find, however, that the court's on-the-record findings were not adequate. A panel of this court recently explained what is required of a district court in determining the relevant conduct of coconspirators:
 
 
 51
 "A co-conspirator is not necessarily responsible for the total amount of cocaine involved in the conspiracy for purposes of establishing his base offense level. Rather, a participant is responsible for other conspirators' conduct only if that conduct was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal activity. U.S.S.G. Sec. 1B1.3, comment. (n. 1) (1989)....
 
 
 52
 * * *
 
 
 53
 * * *
 
 
 54
 "... However, foreseeability is only one of the limitations on the ability of the court to charge one participant in a conspiracy with the conduct of the other participants.... Another limitation on the court's ability to charge a defendant with the conduct of others is that the conduct must be in furtherance of the execution of the 'jointly undertaken criminal activity.'
 
 
 55
 * * *
 
 
 56
 * * *
 
 
 57
 "... Application note 2 to section 1B1.3 (1992) states:
 
 
 58
 Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the 'jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). (Emphasis added.)" United States v. Jenkins, 4 F.3d 1338, 1346-47 (6th Cir.1993), petition for cert. filed, Nov. 18, 1993 (No. 93-6784).
 
 
 59
 The Jenkins court went on to hold that because the district court had neither implicitly nor explicitly addressed the scope of the particular defendant's agreement a remand was necessary so that the district court could address this matter. See id. at 1347.
 
 
 60
 We find no Jenkins-type finding in the record as to defendant Pennell and therefore find it necessary to remand his case for the district court to identify, beyond simply what was foreseeable to Pennell, what Pennell actually agreed to undertake. Perhaps Pennell's agreement was an agreement to remain "on call" (as the enforcer) for the entire duration of the conspiracy; but equally plausible would be a finding that Pennell's agreement was limited to assisting the conspiracy on a few specific occasions, in which case the full 10 grams of LSD were not properly assigned to Pennell as relevant conduct. If the trial court concludes that Pennell's jointly undertaken criminal activity was not coextensive with the activities of the entire conspiracy, the court will need to resentence Pennell based on a revised "relevant conduct" determination.
 
 B
 
 61
 After reviewing Mr. Pennell's prior criminal history, which placed him in Criminal History Category II, the district court concluded that Pennell's history was substantially more serious than that of the average defendant in Category II. Accepting a recommendation of the officer who prepared the presentence investigation report on Mr. Pennell, the court departed from the sentence range indicated by a normal application of the guidelines and imposed a sentence within the range appropriate for a defendant in Criminal History Category III.
 
 
 62
 The Sentencing Guidelines contemplate upward departures in the assignment of a criminal history category where the category otherwise applicable "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. Sec. 4A1.3. When this court reviews such a departure it must first determine whether "the circumstances relied upon by the District Court in departing upward are 'of a kind or degree that may appropriately be relied upon to justify departure." United States v. Belanger, 892 F.2d 473, 475 (6th Cir.1989). This is a question of law, reviewed de novo. Second, we "must determine whether those circumstances actually exist." Id. This is a question of fact, with respect to which we use a "clearly erroneous" standard. Finally, we must "measure the degree and direction of departure from the Guidelines under a standard of reasonableness." Id.
 
 
 63
 In accepting the probation officer's recommendation to depart upward by one criminal history level, the court noted that the original criminal history calculation did not include a state conviction for uttering and publishing a forged instrument--a felony punishable with up to fourteen years of imprisonment. The court further noted that Pennell had a larceny conviction that had not been counted in the criminal history calculation.
 
 
 64
 The court did not err in departing upward. Prior sentences not counted in the calculation of criminal history are among the factors that may justify a departure. See U.S.S.G. Sec. 4A1.3. The uncounted uttering and publishing conviction at issue here was a conviction for a felony involving dishonesty and moral turpitude, and it was punishable by a lengthy prison sentence. The conduct underlying the larceny conviction was of a similar nature. Pennell argues that the court should not have considered the latter conviction because the record does not indicate whether he was represented by (or waived) counsel in that proceeding. The conviction, however, can be used as a factor in departing upward if it represents "reliable information" of underlying criminal behavior. U.S.S.G. Sec. 4A1.3 (back'g). See United States v. Day, 998 F.2d 622, 626 (8th Cir.1993). Mr. Pennell has never denied that he committed larceny, and the trial court did not err in treating the conviction as a reliable indication of larcenous behavior. The degree of departure was objectively reasonable, finally, the court having departed upward by only one category.
 
 C
 
 65
 Mr. Virta argues that the court erred in giving him an enhancement of two offense levels under U.S.S.G. Sec. 3B1.1(b) for playing a managerial or supervisory role in the conspiracy. The court's finding that Mr. Virta performed such a role is a factual one, which we will not upset absent clear error.
 
 
 66
 The court found as a fact that Mr. Virta directed his wife to arrange his meetings with Galbraith, Pennell and Dubay in Bay City. Mr. Virta contends that his wife was the one doing the directing, or that their roles were at least equal, but the record does not show the district court's contrary conclusion to have been clearly erroneous.
 
 D
 
 67
 Finally, Mr. Virta contests the district court's imposition of a two-level enhancement for obstruction of justice. This enhancement was predicated on the court's evaluation of the testimony given by Mr. Virta when he took the stand to testify on behalf of his wife. This testimony was evasive and vague, and it was marked by numerous asserted lapses of memory. At the time of sentencing the judge characterized the testimony as "palpably false," stating that he had made contemporaneous bench notes to the effect that the entirety of the testimony given by Mr. Virta during his second appearance on the stand was perjurious. The court stated that the question of Mr. Virta's veracity was "not ... even close."
 
 
 68
 An enhancement for obstruction of justice is appropriate when a defendant testifies falsely at trial on a material matter. United States v. Dunnigan, 113 S.Ct. 1111 (1993). This court has held that the enhancement is mandatory when the trial judge finds perjury. United States v. Morgan, 986 F.2d 151, 153 (6th Cir.1993). In citing contemporaneous bench notes to the effect that Mr. Virta's second round of testimony was "palpably false," the court satisfied the requirement that it make a clear finding that the defendant lied under oath. United States v. Burnette, 981 F.2d 874, 879 (6th Cir.1992). It is worth mentioning that Mr. Virta's counsel did not contend at the sentencing hearing that Mr. Virta had testified truthfully when he answered questions about his wife; rather, counsel objected to Mr. Virta's being recalled to the stand at all. The factual findings on which the enhancement was based are not clearly erroneous.
 
 E
 
 69
 Mr. and Mrs. Virta have asked this court to remand their cases for resentencing in light of a recent amendment to the Sentencing Guidelines.[3] Effective November 1, 1993, U.S.S.G. Sec. 2D1.1(c) provides that the weight of LSD for sentencing purposes is to be determined by multiplying the number of LSD doses borne on a carrier medium (such as blotter paper) by 0.4 milligrams. U.S.S.G. App.C, Amendment 488 (1993). Prior to this amendment, blotter paper weight was included in the calculation of the quantity of LSD. Chapman v. United States, 111 S.Ct. 1919 (1991).
 
 
 70
 The district court found the Virtas responsible for 10.004 grams of LSD consisting of 1610 doses carried on blotter paper. If the calculation methodology of the amended Sec. 2D1.1(c) were to be used, the drug quantity for 1610 doses of LSD on blotter paper would be only 644 milligrams (1610 X 0.4 mg). The lower weight would result in a reduction of the base offense level from 32 to 22, and a correspondingly shorter prison sentence.
 
 
 71
 The Sentencing Commission has the authority to decide whether and to what extent amendments to the guidelines may be applied retroactively to reduce sentences. Braxton v. United States, 111 S.Ct. 1854, 1858 (1991). In U.S.S.G. Sec. 1B1.10, the Sentencing Commission designated Amendment 488 as one that a district court could use to grant a reduction of sentence under 18 U.S.C. Sec. 3582(c)(2). Under U.S.S.G. Sec. 1B1.10 and 18 U.S.C. Sec. 3582(c)(2) a sentencing court is not required to reduce a given sentence in accordance with an amended guideline, but has discretion to do so. See United States v. Coohey, 11 F.3d 97 (8th Cir. Dec. 3, 1993) (discussing modification of sentence under Amendment 488).
 
 
 72
 In deciding whether to reduce a sentence in accordance with an amendment designated for potential retroactive application, the sentencing court's discretion is guided by the terms of 18 U.S.C. Sec. 3553(a).[4] 18 U.S.C. Sec. 3582(c)(2). The court is also to consider the sentence that would have been imposed had the amendment been in effect at the date of the original sentencing. U.S.S.G. Sec. 1B1.10(b). Where the amendment would have resulted in a much more lenient sentence, the court should give closer consideration to the motion for a reduction.
 
 
 73
 Because the district court committed no error in sentencing the Virtas under the guidelines as they existed at the time of sentencing, we shall not vacate the sentences at this juncture. Instead, we shall remand the Virtas' cases to the district court to allow that court to determine whether Amendment 488 should be applied retroactively as to them.[5] See Coohey, 11 F.3d at 101.
 
 
 74
 The convictions and sentences of Oscar and Tina Virta, and Timothy Galbraith are AFFIRMED. The convictions of Paul Mousseau and Victor Pennell are AFFIRMED, and their sentences are VACATED. The cases of Messrs. Mousseau and Pennell, and Mr. and Mrs. Virta are REMANDED to the district court for further sentencing proceedings not inconsistent with this opinion.
 
 
 
 [1]
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [2]
 All six defendants were charged with one count of conspiracy to distribute LSD and marijuana. Additional charges were made as follows. Oscar Virta: two counts of distributing marijuana; one count of distributing cocaine; seven counts of distributing LSD; one count of utilizing a communication facility for the distribution of LSD; and two counts of possession with intent to distribute LSD. Timothy Galbraith: one count of using a communication facility and three counts of distributing LSD. Tina Marie Virta: one count of utilizing a communication facility and one count of distributing LSD. Paul Mousseau: two counts of distributing LSD. Tricia Dubay: two counts of distributing LSD. Victor Pennell: one count of distributing LSD
 
 
 [3]
 Mr. Mousseau requests similar relief. We already have determined that Mr. Mousseau is to be resentenced. His new sentence should be calculated under the amended Guidelines, as should that of Mr. Pennell
 
 
 [4]
 Section 3553(a) provides a list of factors for a court to consider in passing a sentence, including: "the nature and circumstances of the offense and the history and characteristics" of the offender; the need to provide adequate deterrence against criminal conduct; and the goal of avoiding unwarranted disparities in sentencing
 
 
 [5]
 Even without a remand, of course, 18 U.S.C. Sec. 3582(c)(2) would permit the Virtas, the Bureau of Prisons, or the district court acting sua sponte to move for retroactive application of Amendment 488